IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | NO: 6:25-CV-00429 |
| | § | |
| $2,218,211.45 IN UNITED STATES | § | |
| CURRENCY; | § | |
| 268.33519051 IN USD COIN; | § | |
| 319618.4407582 IN TETHER USD; | § | |
| 1.6255530268 IN ETHEREUM; AND | § | |
| 10.24738425 IN BITCOIN, | § | |
| Defendants. | § | |

## AFFIDAVIT IN SUPPORT OF COMPLAINT FOR FORFEITURE

I, Jeffrey Williams, after being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent (SSA) with the Homeland Security Investigations

(HSI) I am stationed in Tyler, Texas, and have been a Special Agent for over twenty

years.  I was previously employed as a Special Agent with the United States Secret

Service (USSS) from September 2004 to September 2014 and have been so employed

since September 2001.  During my tenure with HSI and USSS, I have been assigned to

investigate violations of federal laws, including violations of Title 18 of the United States

Code, specifically those related to the passing of counterfeit United States currency,

money laundering, human trafficking drug trafficking and cybercrimes.  I received

criminal investigative training at the Federal Law Enforcement Training Center in

Glynco, Georgia, and at the James J. Rowley Secret Service Training Center in Beltsville,

Maryland, pertaining to criminal investigations of counterfeit currency, money

laundering, wire fraud, drug trafficking, human trafficking, child exploitation and identity

theft.   During my employment with the HSI and USSS, I have conducted investigations

resulting in the arrest of suspects and seizures of criminally derived property.  As a law

enforcement officer, I have used a variety of methods to investigate criminal activity,

including, but not limited to, visual surveillance, witness interviews, the use of search

warrants, confidential informants, and undercover agents. I have been the Affiant for and

have participated in the execution of numerous search and arrest warrants.

2.     The statements contained in this affidavit are based in part upon my

experience, my knowledge of the facts and circumstances surrounding this investigation,

and on information provided to me by other law enforcement personnel and other

witnesses.

## PROPERTY FOR FORFEITURE

3.     This Affidavit is made in support of a civil forfeiture complaint concerning

Payward Interactive, Inc. (Kraken) account AA42N84GO66E3Z6Y (TARGET

ACCOUNT) and the following personal property:

a.     $2,218,211.45 in United States Currency;

b.     268.33519051 in USD Coin;

    c.      319618.4407582 Tether USD;

    d.      1.6255530268 Ethereum; and

    e.      10.24738425 Bitcoin

(collectively, the "DEFENDANT PROPERTY") that was seized on or about February 6,

2024, in Tyler, Texas pursuant to a seizure warrant.

## LEGAL AUTHORITY FOR FORFEITURE

4.      As set forth in this affidavit, I have probable cause to believe that violations

of 18 U.S.C. § 1084 (Transmission of Wagering Information); 18 U.S.C. § 1955 (Illegal

Gambling Business); and 18 U.S.C. §§ 1956 and 1957 (Money Laundering) have been

committed by Mario Turcios, Patrick Woodbridge Turcios, and others, known and

unknown, and the proceeds of the violations, the property involved in the transactions,

and the property used in such violations are traceable to the Target Account, thereby

making the Subject Assets subject to seizure and forfeiture to the United States via

criminal seizure warrant and civil seizure warrant.

5.      The Subject Assets are therefore subject to forfeiture to the United States

pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), and § 1955(d).  As to civil

forfeiture, under 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in

a transaction or attempted transaction" in violation of 18 U.S.C. §§ 1956 or 1957 or "any

property traceable to such property" is subject to forfeiture to the United States.  Under

18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which represents or is

traceable to the gross receipts obtained, directly or indirectly, from a violation of" "any offense constituting 'specified unlawful activity,' or a conspiracy to commit such offense" is subject to forfeiture to the United States.   Under 18 U.S.C. § 1955(d), "[a]ny property, including money, used in violation of the provisions of [18 U.S.C. § 1955] may be seized and forfeited to the United States."

6.    I submit this application and affidavit in support of forfeiture of the DEFENDANT PROPERTY described above.

## BACKGROUND ON CRYPTOCURRENCY

7.    Based on my training, research, education, and experience, I am familiar with the following relevant terms and definitions:

a.    Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency[1] or other cryptocurrencies.   Examples of cryptocurrency are Bitcoin, Litecoin, Ether, and Tether (USDT).   Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers.   Although not usually stored in any physical form, public and private keys (described below) used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object.   Cryptocurrency can be exchanged directly

---

[1] Fiat currency is currency issued and regulated by a government such as the U.S. Dollar, Euro, or Japanese Yen.

person to person, through a cryptocurrency exchange, or through other intermediaries. Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.[2] Cryptocurrency is not illegal in the United States.

b.     A blockchain is a digital ledger run by a decentralized network of computers referred to as "nodes." Each node runs software that maintains an immutable and historical record of every transaction utilizing that blockchain's technology. Many digital assets, including virtual currencies, publicly record all of their transactions on a blockchain, including all of the known balances for each virtual currency address on the blockchain. Blockchains consist of blocks of cryptographically signed transactions, and blocks are added to the previous block after validation and after undergoing a consensus decision to expose and resist tampering or manipulation of the data. There are many different blockchains used by many different virtual currencies. For example, Bitcoin in its native state exists of the Bitcoin blockchain, while Ether (or "ETH") exists in its native state on the Ethereum network.

---

[2] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

c.     Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency.  Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

d.     Tether Limited ("Tether") is a company that manages the smart contracts and the treasury (*i.e.,* the funds held in reserve) for USDT Tokens ("USDT").  USDT is a cryptocurrency stablecoin.  Unlike other cryptocurrencies such as Bitcoin whose price tends to fluctuate more unpredictably, Tether tries to hold its value around a specific asset. As a stablecoin, it is pegged or "tethered" to the U.S. dollar as the coin's name suggests in order to minimize price volatility. Payments or transfers of value made with Tether are recorded on blockchains and thus are not maintained by any single administrator or entity.  As mentioned above, individuals can acquire Tether through exchanges (i.e., online companies which allow individuals to purchase or sell cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), cryptocurrency ATMs, or directly from other people.  Individuals can send and receive cryptocurrencies online using many types of electronic devices, including laptop computers and smart phones. Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a blockchain, the identities of the individuals or entities behind the

public addresses are not recorded on these public ledgers.  If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity.  Tether transactions are therefore sometimes described as "pseudonymous," meaning that they are partially anonymous.  And while it is not completely anonymous, Tether allows users to transfer funds more anonymously than would be possible through traditional banking and financial systems.

   e. Cryptocurrency is stored in a virtual account called a wallet.  Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency.  A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address or key.  To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key").   A public address is represented as a case-sensitive string of letters and numbers, 26–25 characters long.  Each public address is controlled and/or accessed through the use of a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address.  Only the holder of an address' private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

f.    Although cryptocurrencies such as bitcoin have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering and is an oft-used means of payment for illegal goods and services.  By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track transactions.

g.    Exchangers and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including on a tangible, external device ("hardware wallet"), downloaded on a PC or laptop ("desktop wallet"), with an Internet-based cloud storage provider ("online wallet"), as a mobile application on a smartphone or tablet ("mobile wallet"), printed public and private keys ("paper wallet"), and as an online account associated with a cryptocurrency exchange.  Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (*e.g.*, smart phones or tablets) or at websites that users can access via a computer, smart phone, or any device that can search the Internet.  Moreover, hardware wallets are located on some type of external or removable media device, such as a USB thumb drive or other commercially available device designed to store cryptocurrency (*e.g.*, Trezor, Keepkey, or Nano Ledger).  In addition, paper

wallets contain an address and a QR code[3] with the public and private key embedded in the code.  Paper wallet keys are not stored digitally.  Wallets can also be backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words strung together in a phrase) or a complex password.  Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase).  I also know that individuals possessing cryptocurrencies often have safeguards in place to ensure that their cryptocurrencies become further secured in the event that their assets become potentially vulnerable to seizure and/or unauthorized transfer.

     h.     Bitcoin "exchangers" and "exchanges" are individuals or companies that exchange bitcoin for other currencies, including U.S. dollars.  According to Department of Treasury, Financial Crimes Enforcement Network ("FinCEN") Guidance issued on March 18, 2013, virtual currency administrators and exchangers, including an individual exchanger operating as a business, are considered money services businesses.[4]  Such exchanges and exchangers are required to register with FinCEN and have proper state licenses (if required under applicable state law).  From my training and experience, I know that registered money transmitters are required by law to follow Bank Secrecy Act anti-money

---

[3] A QR code is a matrix barcode that is a machine-readable optical label.
[4] *See* "Application of FinCEN's Regulations to Person Administering, Exchanging, or Using Virtual Currencies," *available at* https://www.fincen.gov/resources/statutes-regulations/guiadance/application-fincens-regulations-persons-administering.

laundering ("AML") regulations, "Know Your Customer" ("KYC") protocols, and other verification procedures similar to those employed by traditional financial institutions. For example, FinCEN-registered cryptocurrency exchangers often require customers who want to open or maintain accounts on their exchange to provide their name, address, phone number, and the full bank account and routing numbers that the customer links to an exchange account.  As a result, there is significant market demand for illicit cryptocurrency-for-fiat currency exchangers, who lack AML or KYC protocols and often also advertise their ability to offer customers stealth and anonymity.  These illicit exchangers routinely exchange fiat currency for cryptocurrencies by meeting customers in person or by shipping cash through the mail.  Due to the illicit nature of these transactions and their customers' desire for anonymity, such exchangers are frequently able to charge a higher exchange fee, often as high as 9–10% (in contrast to registered and BSA-compliant exchangers, who may charge fees as low as 1–2%).

     i.     Some companies offer cryptocurrency wallet services which allow users to download a digital wallet application onto their smart phone or other digital device.  A user typically accesses the wallet application by inputting a user-generated PIN code or password.  Users can store, receive, and transfer cryptocurrencies via the application; however, many of these companies do not store or otherwise have access to their users' funds or the private keys that are

necessary to access users' wallet applications.  Rather, the private keys are stored

on the device on which the wallet application is installed (or any digital or

physical backup private key that the user creates).  As a result, these companies

generally cannot assist in seizing or otherwise restraining their users'

cryptocurrency.  Nevertheless, law enforcement could seize cryptocurrency from

the user's wallet directly, such as by accessing the user's smart phone, accessing

the wallet application, and transferring the cryptocurrency therein to a law

enforcement-controlled wallet.  Alternatively, where law enforcement has

obtained the recovery seed for a wallet (see above), law enforcement may be able

to use the recovery seed phrase to recover or reconstitute the wallet on a different

digital device and subsequently transfer cryptocurrencies held within the new

wallet to a law enforcement-controlled wallet.

      j.     Law enforcement can trace transactions on blockchains to determine

which virtual currency addresses are sending and receiving particular virtual

currency. This analysis can be invaluable to criminal investigations for many

reasons, including that it may enable law enforcement to uncover transactions

involving illicit funds and to identify the person(s) behind those transactions. To

conduct blockchain analysis, law enforcement officers use reputable, free open-

source blockchain explorers, as well as commercial tools and services. These

commercial tools are offered by different blockchain-analysis companies. Through

numerous unrelated investigations, law enforcement has found the information associated with these tools to be reliable.

k.     A decentralized exchange (or "DEX") is a peer-to-peer marketplace where users can trade virtual currencies directly with other traders without centralized intermediaries. Users generally retain control over their virtual currency rather than entrusting a central authority to host funds in a centralized or "hosted" wallet. DEXs are operated by self-executing agreements written in code, known as "smart contracts," which automate the trading process. DEXs will algorithmically track the prices of various virtual currencies and often leverage locked reserves of virtual currencies (or other digital assets). These locked reserves are known as "liquidity pools," and they are often used to facilitate trades. DEXs are built on blockchains that support smart contracts, including Ethereum, and often levy fees for their services.

## FACTS SUPPORTING FORFEITURE

8.     Homeland Security Investigations (HSI) is investigating Betonline.ag, an unlawful internet gambling operator which offers illegal offshore gaming and sports setting. The investigation concerns possible violations of, inter alia, 18 U.S.C. § 1084 (Transmission of Wagering Information); 18 U.S.C. § 1955 (Illegal Gambling Business); 31 U.S.C. § 5363 (Prohibition on Acceptance of any Financial Instrument for Unlawful Internet Gambling); and 18 U.S.C. §§ 1956 and 1957 (Money Laundering).

9.      The case involves unlawful internet gambling available through offshore websites and are readily accessible through the use of a smart phone or computer with an internet connection.  These unlawful gambling websites enjoy many competitive advantages that allow them to offer better odds and promotions because they do not pay state and federal taxes or bear regulatory compliance costs and associated obligations.  Additionally, these unlawful gambling websites, which often operate sportsbooks and casinos, do not meet regulatory standards to ensure fair play and payouts, age-verification, or security of personal and financial data.  One business, identified as Betonline (betonline.ag) is an online gambling company offering sports betting, online casinos, poker, and wagering on horse racing.  Betonline facilitates illegal online gambling in the United States.

10.      The investigation has revealed that a wallet associated with the Target Account received cryptocurrency deposits from U.S.-based Betonline customers.

11.      During the investigation, an individual deposited cryptocurrency into a Betonline account that was created to place illegal wagers between 2023 and 2024.

**2023 and 2024 Deposits and Wagers**

12.      In 2023 and 2024, an individual deposited cryptocurrency into a provided address from Betonline.ag and subsequently wagered on sporting events and contests throughout 2023 and 2024.

After receiving the cryptocurrency, Betonline, based on blockchain tracing, transferred the cryptocurrency through several intermediary wallets.[5]  These tracings ultimately resolved to receiving address, 3JuTjydDxbMosMwdPfXLwUxtsE3xDmKrGP.

### Payward Interactive Inc./ Kraken Records

13.    In 2024, Payward Interactive Inc., 237 Kearney Street #102, San Francisco, California 94108 was issued Federal Grand Jury Subpoena (24-0001-01) to produce records associated with the owners of 3JuTjydDxbMosMwdPfXLwUxtsE3xDmKrGP (KrGP).   KrGP is associated with Kraken account AA42 N84GO66E3Z6Y (the Target Account) utilized by Digital Gravel Media LLC, 333 SE 2nd Ave., Ste. 2000, Miami, Florida 33131.  Business documents indicate that the managers of Digital Gravel Media LLC are Mario Turcios, a U.S. citizen, and Patrick Woodbridge Turcios, a citizen of Costa Rica, both of whom list residences in Miami, Florida.  Business records indicate that Digital Gravel Media LLC, a marketing company, was formed on March 1, 2023.  Account 3Z6Y was registered on March 14, 2023, to Digital Gravel Media LLC, username: gdmedia, email: gravel.wallets@gmail.com.  The first transaction in the wallet occurred on October 5, 2023.  The account sees rapid flows of cryptocurrency and stablecoins deposited with USD withdrawals.

---

[5] Intermediary wallets are typically private wallets or non-exchange wallets that allow users to obfuscate transactions on the Blockchain.  Intermediary wallets support money laundering as they help conceal and disguise the source of the cryptocurrency by layering and severing straight line coordinates of transaction activity on the Blockchain and transfers to cash out exchangers.

14.    Between October 5, 2023 and November 12, 2023, the account saw flows totaling $12,209,463.31 U.S. dollars over 234 transactions.  Of that amount, approximately $6,462,378.35 U.S. dollars were deposits (3,792,450.378 USDT, 0.81865939 ETH, and 82.4903726 BTC), and $5,747,085 were withdrawals (0.02895 BTC and $5,746,095.91U.S. dollars).

15.    Between October 5, 2023 and January 5, 2024, 241.6796 BTC (equivalent to $9,667,185) was deposited into the Target Account.  A majority of the funds were withdrawn through 75 transfers to an associated Chase Bank account and 19 transfers to an associated Bank of America account.

16.    According to Chainalysis[6] records, between October 5, 2023 and the present, 332.113 BTC ($14,161,630.43) has been deposited into the Target Account.

**Other Similar Companies**

17.    During my investigation, I received additional records from Kraken that indicate Patrick Woodbridge Turcios established a separate Kraken account, AA37N84GAXEKTF7A (TF7A) on January 13, 2022, nearly a year before the Digital Gravel Media Kraken account.  Records show that the account is registered to Orfelio Tech Industry LLC (Orfelio Tech), 9251 South West 13th St., Miami, Florida 33174.

---

[6] Chainalysis is a company that provides data, software services, and research to government agencies, financial institutions, and insurance and cybersecurity companies in over 70 countries.  Chainalysis data supports investigations, compliance, and market intelligence software that has been used to solve some of the world's most high-profile criminal cases and grow consumer access to cryptocurrency safely. Chainalysis Reactor is Chainalysis' investigative software which connects cryptocurrency transactions to real-world entities. Through the use of Chainalysis Reactor, criminal activities, such as the movement of stolen funds, as well as legitimate activities such as flash loans and NFT transfers can be examined.

Notably, this address is the site of a single-family residence.  Patrick Woodbridge Turcios is a majority owner of Orfelio Tech.  Orfelio Tech advertises on its website (orfeliotech.com) to be a business consultant company.

18.    Kraken records show that from June 1, 2022 to September 29, 2022, there were more than $20 million dollars in transactions through Orfelio Tech's Kraken account.

19.     Kraken records show that account TF7A has received significant funds from illegal gambling websites.

**Coinbase Records**

20.    During my investigation, I have become aware of other funds derived from illegal and unlicensed gambling ultimately traced to the Target Account.  Blockchain analysis showed transactions originating at Coinbase deposited into the same Target Account.

21.    On January 22, 2024, Coinbase, 548 Market St. #23008, San Francisco, California 94104, was issued a Federal Grand Jury Subpoena (24-0001-02) to produce records associated with the following transaction and wallet IDs:

Date: 12/17/23
TX ID:
9ea052ee74db2b12f7180c59685048c55f424c418214444b11ff1d0c1e5d11b9
Wallet ID: bc1qjp2nncpf989cw3zql5nx4yaryslw3has49cgtn

Date: 12/26/23
TX ID:
9ea052ee74db2b12f7180c59685048c55f424c418214444b11ff1d0c1e5d11b9
Wallet ID: bc1q2s5f9dyjwc6w09x6n993f982nc44rknttmzh9l

Date: 12/24/23
TX ID:
1866daebcc53f4503451732364fd24334a2bf51065bc35713b7110dcbd0446a0
Wallet ID: bc1qvc5n40ejycr4n9jezqs3zyy84y6tvs48qalhu5

22.    On January 24, 2024, I reviewed the records produced by Coinbase and

contacted three other bettors whose cryptocurrency bets were deposited into the Target

Account.

      a.    I telephonically interviewed J.V., who confirmed that she made a

              BTC deposit on December 26, 2023, into the Betonline player

              account for wagers on casino games while she was located in Texas.

      b.    I telephonically interviewed L.T., who confirmed that he made

              multiple BTC deposits to his Betonline player account, to include a

              deposit on December 24, 2023, for gambling while he was located in

              New York.

      c.    I telephonically interviewed E.V.Z.M. and exchanged email

              communication with E.V.Z.M.  E.V.Z.M. confirmed that he

              deposited cryptocurrency from his Coinbase account to Betonline on

December 17, 2023, for the purpose of sports betting while he was

located in Texas.

**Tracing Deposits**

23.     The transaction tracing for 2023, BTC deposit (Transaction 1) were

consolidated as shown in Figure 1, revealed the following:

<u>**FIGURE 1**</u>



a.     The deposit address provided by Betonline remitted to an

intermediary address that ultimately deposited to

bc1qkjqd8a276h39q69l8t90gmz8wctzcd8uwe2eat (2eat).

b.     Through blockchain analytics, Chainalysis identified this deposit

address as being associated with cluster 2eat.  Chainalysis analytics

reports reveal a total of 617 separate depositaddresses associated

with cluster 2eat.  In all but one case, each deposit address made one

deposit into 2eat.[7]  The deposits were generally made from CashApp (61%), Coinbase (19%), and other cryptocurrency exchanges and fintech companies.  The average deposit amount was approximately $100.00.

c.    On December 29, 2023, cluster address 2eat remitted 1.478 BTC to deposit address bc1qhp63mk69w46dqfzq9nw57at5a5tss8qz5vlaz7 (laz7).

d.    On December 29, 2023, deposit address laz7 remitted 14.1048656 BTC to deposit address bc1qpeaqsmztvvykh0wv2x3tdaflj06tuskpuz2a3t (2a3t).  Chainalysis reports show a total of 3 separate deposit addresses being associated with cluster 2a3t.  There were a total of 7 deposits into 2a3t. Ninety-nine percent of all deposits from 2a3t were made to the wallet associated with the Target Account, hereinafter referred to as "Target Wallet" in terms of block chain tracing.

e.    On December 29, 2023, deposit address 2a3t remitted 13.99286364 BTC to the Target Wallet.

24.    The transaction tracing for 2024, BTC deposit (Transaction 2) were consolidated as shown in Figure 1, revealed the following:

---

[7] In one case, one deposit address made two deposits into 2eat.

a.    The deposit address provided by Betonline remitted to an intermediary address that ultimately deposited to bc1q6l8epk5mhhwkza9vru8t0f38mxqtg30f7cjkaw (jkaw).

b.    Through blockchain analytics, Chainalysis identified this deposit address as being associated with cluster jkaw.  Chainalysis analytics reports a total of 312 separate deposit addresses being associated with cluster jkaw.  Each deposit address made one deposit into jkaw. The deposits were generally made from CashApp (56%), Paxos (7%), Coinbase (6%), and other cryptocurrency exchanges and fintech companies.  The average deposit amount was approximately $50.00.

c.    On January 11, 2024, cluster address jkaw remitted 0.5 BTC to deposit address bc1qk0fy87gnntk9xz350le3acg23dzprwdv2enyjw (nyjw).

d.    Through blockchain analytics, Chainalysis identified deposit address nyjw as being associated with cluster address bc1qpg2n8r6vxh8c74sdctwzgmwaujh9apdjjphc2f (hc2f). Chainalysis reports a total of 13 separate deposit addresses being associated with cluster hc2f.

e.    On January 12, 2024, cluster address hc2f remitted 6.41764744 BTC to deposit address bc1qpeaqsmztvvykh0wv2x3tdaflj06tuskpuz2a3t (2a3t).

f.    On January 12, 2024, deposit address 2a3t remitted 6.55164883 BTC to the Target Wallet.

25.    On January 12, 2024, deposit address 2a3t remitted 6.55164883 BTC to the Target Wallet.

**Tracing Other Bettors to the Target Wallet**

<u>Bettor L.T.</u>

26.    Tracings of the Blockchain were conducted on bettor L.T. who purported to be located in the State of New York, as shown in Figure 2.  Notable transactions are described below:

**<u>FIGURE 2</u>**



27.    Transaction 1:  Using Chainalysis Reactor, a Blockchain analytics tool, deposit address bc1qjkhhmzykd0q0pvfdxf9x84m3thahw9ddaqjmds (jmds) provided to L.T. was identified as being associated with cluster address bc1q79qe56vqmmfejaacwra9wg4cjncv2frjxx7w82 (7w82).  Chainalysis analytics reports reveal a total of 603 separate deposit addresses associated with cluster 7w82.  Each deposit address made one deposit into 7w82.  The deposits were generally made from CashApp (61%), Coinbase (23%), and other cryptocurrency exchanges and fintech companies.  The average deposit amount was approximately $100.00.

28.    Transaction 2: Using Chainalysis Reactor, deposit address bc1qvc5n40ejycr4n9jezqs3zyy84y6tvs48qalhu5 (lhu5) provided to L.T. was identified as being associated with cluster address bc1qkjqd8a276h39q69l8t90gmz8wctzcd8uwe2eat (2eat).

29.    Transaction 3: Using Chainalysis Reactor, deposit address bc1qkz49tlymlvm5sr32hgkxgnv6c95689dyjqwhk4 (whk4) provided to L.T. was identified as being associated with cluster address bc1q3cawxpf87sah0tc6el74prmhq9ugj4cpancawj (cawj). Chainalysis analytics reports a total of 642 separate deposit addresses associated with cluster cawj.  Each deposit address made one deposit into cawj.  The deposits were generally made from CashApp (62%),

Coinbase (18%), and other cryptocurrency exchanges and fintech companies.  The average deposit amount was approximately $100.00.

30.    Using Blockchain analytics, the following tracings of funds from cluster 7w82, cluster 2eat, and cluster cawj to the Target Wallet were made:

a.    On December 29, 2023, cluster 7w82 remitted 1.479 BTC to deposit address bc1qhp63mk69w46dqfzq9nw57at5a5tss8qz5vlaz7 (laz7). Chainalysis reports a total of 8 separate deposit addresses being associated with cluster laz7.

b.    On December 29, 2023, cluster 2eat remitted 1.478 BTC to deposit address laz7.

c.    On December 29, 2023, cluster cawj remitted 1.475 BTC to deposit address laz7.

d.    On December 29, 2023, deposit address laz7 remitted 14.1048656 BTC to deposit address bc1qpeaqsmztvvykh0wv2x3tdaflj06tuskpuz2a3t (2a3t).

e.    On December 29, 2023, deposit address 2a3t remitted 13.99286364 BTC to the Target Wallet.

31.    <u>Transaction 4</u>: Using Chainalysis Reactor, deposit address bc1qe3tcvsj6kku34e8wfr5mld632zet8ewzcy6sal (6sal) provided to L.T. was identified as being associated with cluster address bc1qq9rkj9eezxw4pr5taulrmp6kfthljtyfrc5vq2 (5vq2).  Chainalysis analytics reports a total of 292 separate deposit addresses associated

with cluster 5vq2.  In all but one case, each deposit address made one deposit into 5vq2.[8] The deposits were generally made from CashApp (27%), Coinbase (27%), and other cryptocurrency exchanges and fintech companies.  The average deposit amount from cryptocurrency exchanges was approximately $200.00.

 32. Using Blockchain analytics, the following tracings of funds from cluster 5vq2 to the Target Wallet were made as shown in Figure 3:

### **FIGURE 3**



 a. On October 6, 2023, cluster 5vq2 remitted 3 BTC to deposit address bc1qu9rk7xem5djf6g9ynpdz9kt6uz22fk23vsxl0x (xl0x).  Through blockchain analytics, Chainalysis identified deposit address xl0x as being

---

[8] In one case, one deposit address made two deposits into 5vq2.

associated with cluster address

bc1qgr0fp3s2lcxft9msgye73pf9udfyur5tx5yf8h (yf8h).

b.   On October 6, 2023, deposit address xl0x remitted 10.8987866 BTC to

deposit address bc1qgqz7skd4cw2mm3lrrkjs5pfxmf8jfwl7n2atwl (atwl).

Chainalysis reports a total of 4 separate deposit addresses being associated

with cluster atwl.

c.   On October 6, 2023, deposit address atwl remitted 0.5458118 BTC to the

Target Wallet.

33.   A review of the Target Wallet indicates that on February 5, 2024, deposit

address atwl made thirteen deposits into the Target Wallet totaling 8.48415358 BTC.

Bettors E.V.Z.M. and J.V.

Using Chainanalysis Reactor, the following tracings of funds deriving from

Coinbase customer transactions pertaining to individuals residing in the State of

Texas to the Target Wallet were made, as shown in Figure 4:

**FIGURE 4**



Betonline Bettor E.V.Z.M.

    a.    On December 17, 2023, Coinbase customer E.V.Z.M. remitted

0.00118283 BTC to deposit address

bc1qjp2nncpf989cw3zql5nx4yaryslw3has49cgtn (cgtn) provided to

E.V.Z.M.  Through Blockchain analytics, Chainalysis identified

deposit address cgtn as being associated with cluster

bc1q6l8epk5mhhwkza9vru8t0f38mxqtg30f7cjkaw (jkaw).

    b.    On January 11, 2024, cluster address jkaw remitted 0.5 BTC to

deposit address bc1qk0fy87gnntk9xz350le3acg23dzprwdv2enyjw

(nyjw).  Through blockchain analytics, Chainalysis identified deposit

address nyjw as being associated with cluster address

bc1qpg2n8r6vxh8c74sdctwzgmwaujh9apdjjphc2f (hc2f).

c.      On January 12, 2024, cluster address hc2f remitted 6.41764744 BTC

to deposit address bc1qpeaqsmztvvykh0wv2x3tdaflj06tuskpuz2a3t

(2a3t).

Betonline Bettor J.V.

d.      On December 26, 2023, Coinbase customer J.V. remitted

0.00242383 BTC to deposit address

bc1q2s5f9dyjwc6w09x6n993f982nc44rknttmzh9l (zh9l) provided to

J.V.  Through Blockchain analytics, Chainalysis identified deposit

address zh9l as being associated with cluster

bc1qkjqd8a276h39q69l8t90gmz8wctzcd8uwe2eat (2eat).

e.      On December 29, 2023, cluster address 2eat remitted 1.478 BTC to

deposit address bc1qhp63mk69w46dqfzq9nw57at5a5tss8qz5vlaz7

(laz7).

f.      On December 29, 2023, deposit address laz7 remitted 14.1048656

BTC to deposit address

bc1qpeaqsmztvvykh0wv2x3tdaflj06tuskpuz2a3t (2a3t).

**Tracing Proceeds from Deposit Address 2a3t to Target Wallet**

34.     On January 12, 2024, deposit address 2a3t remitted 6.55164883 BTC to the Target Wallet.

## CONCLUSION

35.     I submit that this affidavit supports probable cause to forfeit Payward Interactive, Inc. (Kraken) account AA42N84GO66E3Z6Y (TARGET ACCOUNT) and the following personal property:

a.     $2,218,211.45 in United States Currency;

b.     268.33519051 in USD Coin;

c.     319618.4407582 Tether USD;

d.     1.6255530268 Ethereum; and

e.     10.24738425 Bitcoin.

36.     Based on my experience and the information herein, I have probable cause to believe that the seized Payward Interactive, Inc. (Kraken) account AA42N84GO66E3Z6Y (TARGET ACCOUNT) constitutes proceeds from a specified unlawful activity (as defined in 18 U.S.C. § 1956(c)(7) and 18 U.S.C. § 1961(1)), are proceeds traceable to a money laundering transaction and are therefore subject to forfeiture pursuant to pursuant to 18 U.S.C. § 981(a)(1)(C).  Moreover, these funds were involved in or facilitated money laundering and are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

37.     I also have probable cause to believe that the seized Payward Interactive, Inc. (Kraken) account AA42N84GO66E3Z6Y (TARGET ACCOUNT) constitutes proceeds traceable to a violation of 18 U.S.C. § 1955 and are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).  Moreover, these funds are involved in or facilitated violations of 18 U.S.C. § 1955 and are therefore subject to forfeiture pursuant to 18 U.S.C. § 1955(d).

As provided in 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


JEFFREY S WILLIAMS    Digitally signed by JEFFREY S WILLIAMS
Date: 2025.10.30 10:56:54 -05'00'

Jeffrey Williams, Special Agent
Homeland Security Investigations